ROSEMARY LEDET, Judge.
[ )This is a Hurricane Katrina, commercial property insurance coverage dispute. The sole issue presented is whether the trial court erred in granting a partial mo *1207 tion for summary judgment, finding no coverage for increased construction costs under the “Ordinance or Law” endorsement of the policies at issue. For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
When Hurricane Katrina struck the New Orleans area, the Orleans Parish School Board (“OPSB”) was responsible for overseeing the operations of approximately 126 public schools in the area. Hurricane Katrina significantly damaged the OPSB’s properties. “This litigation began when OPSB filed a lawsuit against its commercial property insurer [Lexington Insurance Company] on August 9, 2006, seeking recovery for damages sustained to certain insured properties as a result of Hurricane Katrina’s August 29, 2005 landfall and its aftermath.” Orleans Parish School Bd. v. Lexington Ins. Co., 11-0009, pp. 1-2 (La.App. 4 Cir. 10/5/11), 76 So.3d 592, 593-94.[1] “As of the time of filing of the original petition, 12OPSB claimed to have received only half of the policy limits on its primary commercial property policy [$25 million].” Id. The OPSB subsequently amended its petition to join as defendants its four excess commercial property insurers — Essex Insurance Company, Clarendon Insurance Company, Westchester Surplus Lines Insurance Company, and RSUI Indemnity Company.[2] The terms of the Lexington policy apply to the Excess Insurers’ policies because the Excess Insurers’ policies are all following-form policies.[3] The coverage the Defendant Insurers provided to the OPSB was structured on the following four levels:[4]
Primary: $50 million per occurrence — Lexington;
First Excess Layer: $25 million per occurrence (from $50 million to $75 million) — shared between Clarendon (60% of up to $25 million or $15 million) and Essex (40% of to $25 million or $10 million)
Second Excess Layer: $25 million per occurrence (from $75 million to $100 million)— Westchester; and
Third Layer: $ 100 million per occurrence (from $ 100 million to $200 million)— RSUI.
On November 30, 2011, the Excess Insurers filed motions for partial summary *1208 judgment on the issue of increased construction cost under the “Ordinance or Law” Endorsement.[5] The motions sought the dismissal of any |3claim for ordinance or law coverage for the cost of code upgrades not actually incurred by the OPSB before August 29, 2007 — two years after Hurricane Katrina. The Excess Insurers pointed out that coverage for code upgrades, if any, would arise under the increased cost to repair provision (Section A(2)) of the Ordinance or Law endorsement in Lexington’s policy, quoted below. The endorsement, however, includes a two-year limitation for such coverage, which the Excess Insurers contended expired on August 29, 2007. The Excess Insurers further contended that to the extent any code upgrades were not actually performed by the OPSB by August 29, 2007, there was a failure to satisfy a condition precedent to recovering under the policies.
The pertinent policy provisions regarding Ordinance or Law coverage (also referred to as “Code Upgrade” coverage) are set forth in the Lexington primary policy, which includes both an exclusion of such coverage and an endorsement adding back limited coverage. As noted, the excess policies follow the terms of the primary policy for purposes relevant to the issue presented in this case.
The exclusion is set forth in a “CAUSES OF LOSS — SPECIAL FORM” of Lexington’s policy, which provides:
We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss,
a. Ordinance or Law
|4The enforcement of any ordinance or law:
1) Regulating the construction, use or repair of any property; or
2) Requiring the tearing down of any property, including the cost of removing its debris.[6]
The endorsement adding back limited coverage is entitled an “Ordinance or Law” endorsement, numbered as “ENDORSEMENT # 002,” and labeled as CP0405 (ed. 07/88); it provides:
A. If a Covered Cause of Loss occurs to covered Building property, we will pay:
[[Image here]]
2. The increased cost to repair, rebuild or construct the property caused by enforcement of building, zoning or land use ordinance or law. If the property is repaired or rebuilt, it must be intended for similar occupancy as the current property, unless otherwise required by zoning or land use ordinance law.
[[Image here]]
*1209 C. We will not pay for increased construction costs under this endorsement:
1. Until the property is actually repaired or replaced at the same premises or elsewhere; and
2. Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed 2 years. We may extend this period in writing during the 2 years.[7]
In support of their respective motions, the Excess Insurers introduced evidence of the Lexington policy and their respective policies. They also [ ^introduced affidavits of representatives of the Defendant Insurers attesting that at no time within the two-year period after Hurricane Katrina (August 29, 2005 to August 29, 2007) did any of the Defendant Insurers extend in writing the two-year limitation period set forth in the Ordinance or Law Endorsement. Illustrative, RSUI’s representative, Michael Koski, Vice President Commercial Property Claims, attested:
6. In the event of a covered loss to covered building property, the Ordinance or Law Coverage endorsement [Endorsement # 002, CP0405] expressly states that we will not pay for increased construction costs under the endorsement until the property is actually repaired or replaced at the same premises or elsewhere, and, unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. The endorsement also states that RSUI may extend this period in writing during the two year period;
7. At no time within the two year period after Hurricane Katrina occurred (August 29, 2005), did RSUI extend, in writing, the period of time within which the coverage for increased construction costs may be incurred as described in Section C(2) of the Ordinance or Law Coverage endorsement.
In opposing the motions for summary judgment, the OPSB contended that there were at least four genuine issues of material fact, which it enumerated as follows: (i) whether the Defendant Insurers’ repeated extensions granted to the OPSB during the claims process included the two-year limitation period; (ii) whether the Defendant Insurers’ actions constituted a waiver of the two-year limitation period; (Hi) whether the Excess Insurers should be estopped from raising the two-year limitation period; and (iv) whether the two-year limitation period was an impossible condition that should not be enforced. The OPSB further contended that summary judgment was premature since discovery was incomplete.
In support of its impossible condition argument, the OPSB introduced an affidavit of its Chief Financial Officer, Stanley C. Smith, who attested:
|fi* I have personal knowledge of the financial status of the School Board before and after Hurricane Katrina.
• I have personal knowledge of the efforts of the Orleans Parish School Board to get schools úp and running after Hurricane Katrina and have knowledge of the financial and non financial challenges which needed to be overcome to get schools open within *1210 the first two years after Hurricane Katrina and to the present.
• The Orleans Parish School Board was unable to get 100% of its properties repaired or rebuilt within the two years after Hurricane Katrina. Principally, among the reasons for our inability to repair or rebuild all the properties was its lack of finances to repair such a large number of properties. It also took substantial time and effort to access all of the properties after Hurricane Katrina and then determine which properties had to be rebuilt or repaired, and where the needs of the children would be post Katrina.
• The time for obtaining necessary funds, complying with Louisiana administrative law to get approval to rebuild or repair schools, perform due diligence with construction companies, issue contracts, in addition to the necessary construction time (which often included delays) made completing repairs and/or rebuilding all of the OPSB properties within 2 years after Hurricane Katrina impossible.
In support of its waiver argument, the OPSB introduced reservation of rights letters from two of the Excess Insurers, Essex and RSUI. In those letters, the Ordinance or Law Exclusion is quoted; the Ordinance or Law Endorsement is mentioned, but not quoted. The two-year limitation period is not mentioned in those letters.
In support of its estoppel argument, the OPSB introduced a series of correspondence documenting the written agreements between the parties to extend both the discovery deadline in this litigation and the policy deadline for filing a proof of loss.[8] Almost all of the correspondence was written after the expiration of [7the two-year limitation period. The two-year limitation period is not mentioned in any of the correspondence.
At the December 15, 2011 motions hearing, the trial court compared the two-year limitation period to a prescriptive period. Granting the motion, the trial court found the endorsement to be “clear and unambiguous,” reasoning as follows:
[I]t is what it is, and Section C-2 of the ordinance covers law under the policy, says “we may extend this period in writing during the two years.” The opposite of that is we may not. If they have definitively said no, I don’t know if we’d be having this discussion. It wasn’t so, I guess that’s why we are. But it is what it is. The policy says what it says, it’s clear and unambiguous.
I grant the motion.
On January 10, 2012, the trial court rendered its judgment finding that “any claim by the OPSB for increased construction costs be and the same are hereby dismissed to the extent that the repairs or replacement were not made by August 29, 2007 (2 years from the date of the loss).” The trial court declared that “there is no just reason for delay on this coverage issue,” and it designated its judgment as a “final partial summary judgment as to the issue of coverage under the Ordinance or Law Coverage endorsement.” See La. C.C.P. art. 1915 B. No written reasons were provided for the judgment.
The OPSB filed a motion for new trial. In its motion, the OPSB raised the following four issues: (i) whether the two-year limitation is null and unenforceable under *1211 La. C.C. art. 1769 (providing that “[a] sus-pensive condition that is unlawful or impossible makes the obligation null”), and La. C.C. art. 1770 (providing that “[a] sus-pensive condition that depends solely on the whim of the obligor makes the obligation null”); (ii) whether the two-year limitation period should be regarded as fulfilled due to the Defendant Insurers’ hindering the ability of the OPSB to | Bcomply with the two-year limitation period pursuant to La. C.C. art. 1772 (providing that “[a] condition is regarded as fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment”); (iii) whether the policy as written is ambiguous in its interpretation and meaning; and (iv) whether there was “good cause” for a new trial.
On April 16, 2012, the trial court denied the OPSB’s motion for new trial. In so doing, the trial court provided the following reasons for judgment:
The Court, after oral arguments, at the signing of the Judgment, and now, finds that this provision of the policy is unambiguous. The Louisiana Supreme Court held, “the determination of whether a contract is clear or unambiguous is a question of law.” Cadwallader v. Allstate Ins. Co., 848 So.2d 577, 580 (La.6/27/2003). Further, when the terms of a policy are unambiguous, the “courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation.” Id. The Lexington policy, and thus the Westchester and RSUI policies, clearly does not provide coverage under this endorsement beyond the two year time frame.
The instant appeal followed.
DISCUSSION
The standard of review of a trial court’s ruling granting a motion for summary judgment, pursuant to La. C.C.P. arts. 966 and 967 and the jurisprudence, is well-settled and can be summarized as follows:
Appellate courts review the grant or denial of a motion for summary judgment de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. This standard of review requires the appellate court to look at the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, to determine if they show that no genuine issue as to a material fact exists, and that the mover is entitled to judgment as a matter of law. A fact is material when its existence or nonexistence may be essential to the plaintiffs [sic] cause of action under the applicable theory of recovery; a fact is material if it potentially insures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, no need for trial |9on that issue exists and summary judgment is appropriate. To affirm a summary judgment, we must find reasonable minds would inevitably conclude that the mover is entitled to judgment as a matter of the applicable law on the facts before the court.
The summary judgment procedure is designed to secure the just, speedy and inexpensive determination of actions. Summary judgments are favored, and the summary judgment procedure shall be construed to accomplish these ends. The code provides that where [as in the instant case] the party moving for summary judgment will not bear the burden of proof at trial, their burden does not require them to negate all essential elements of the adverse party’s claim, but rather to point out to the court that an absence of factual support exists for one *1212 or more elements essential to the adverse party’s claim. Thereafter, if the adverse party fails to produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden of proof at trial, no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law. The adverse pai'ty cannot rest on the mere allegations or denials of his pleadings when a motion for summary judgment is made and supported by affidavits, but is required to present evidence establishing that material facts are still at issue.
Teter v. Apollo Marine Specialities, Inc., 12-1525, pp. 6-7 (La.App. 4 Cir. 4/10/13), 115 So.3d 590, 597 (quoting Johnson v. Loyola University of New Orleans, 11-1785, pp. 7-8 (La.App. 4 Cir. 8/8/12), 98 So.3d 918, 923-24); see also McGowan v. Housing Authority of New Orleans, 12-1418, p. 12 (La.App. 4 Cir. 3/27/13), 113 So.3d 1143, 1148 (quoting Johnson, 11-1785 at pp. 7-8, 98 So.3d at 923-24).
Whether an insurance policy provides for, or precludes, coverage as a matter of law is an issue that can be resolved within the framework of a motion for summary judgment. Sumner v. Mathes, 10-0438, p. 6 (La.App. 4 Cir. 11/24/10), 52 So.3d 931, 935. Generally, the interpretation of an insurance policy is a question of law. Armenia Coffee Corp. v. American National Fire Ins. Co., 06-0409, p. 6 (La.App. 4 Cir. 11/21/06), 946 So.2d 249, 253. Likewise, the | ^determination of whether a contract is clear or ambiguous is a question of law. Cadwalladerv. Allstate Ins. Co., 02-1637, p. 4 (La.6/27/03), 848 So.2d 577, 580. On the other hand, when a contract is determined to be ambiguous, an issue of material fact exists; and the matter is not ripe for summary judgment. Johnson v. Orleans Parish School Bd., 10-1388, p. 11 (La.App. 4 Cir. 12/20/11), 80 So.3d 1175, 1183 (citation omitted).
In analyzing insurance policies, the following elementary legal principles apply:
• An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Civil Code.
• The parties’ intent as reflected by the words in the policy determine the extent of coverage. Such intent is to be determined in accordance with the general, ordinary, plain and popular meaning of the words used in the policy, unless the words have acquired a technical meaning. LSA-C.C. Art. 2047.
• An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion.
• Absent a conflict with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their liability and to impose and to enforce reasonable conditions upon the policy obligations they contractually assume.
• [I]f the policy wording at issue is clear and unambiguously expresses the parties’ intent, the insurance contract must be enforced as written. LSA-C.C. Art.2046 (providing that when the words of a contract are clear, no further interpretation may be made to determine the parties’ intent).
• When the language of an insurance policy is clear, courts lack the authority to change or alter its terms under the guise of interpretation. The determination of whether a contract is clear or ambiguous is a question of law.
*1213 Louisiana Ins. Guar. Ass’n v. Interstate Fire & Cas. Co., 93-0911 (La.1/14/94), 630 So.2d 759, 763-64 (citations omitted).
On appeal, the OPSB’s sole assignment of error is whether “[t]he trial court erred in its finding that the OPSB’s claims for ‘increased construction costs’ are dismissed with prejudice to the extent that the repairs or replacements of damaged properties were not made by August 29, 2007 (2 years from the date of loss).” The OPSB contends that there are four undisputed facts, which it enumerates as follows:
First, during the two year period (and indeed until 2011), the Defendant Insurers repeatedly granted the OPSB extensions of time to submit proofs of loss for the catastrophic damages it sustained as a result of Hurricane Katrina and its aftermath.
Second, the Defendant Insurers’ own adjusters did not complete their inspections and estimates until sometime after May 2006, and then repriced their estimates in 2007, the same year the Defendants Insurers now claim OPSB should have repaired or replaced all of its buildings.
Third, the Defendant Insurers only tendered $25 million (of the $200 million combined policy limits) to the OPSB within the two years after the loss even though their own adjusters’ initial net assessments of loss for the OPSB hurricane (non-flood) damages exceeded $82 million, and the OPSB submitted repair invoices for $71 million.
Fourth, the Defendant Insurers failed to raise the two year repair condition in their reservation of rights letters and pleadings until after the two years lapsed thereby leading the OPSB into believing it would not be enforced.
The OPSB contends that these undisputed facts render summary judgment improper because there are genuine issues of material fact. Alternatively, it contends that application of the law to these facts leads to the conclusion that the two-year limitation period is unenforceable.
For purposes of this discussion, we subdivide the OPSB’s arguments into the following four categories: (i) ambiguous policy language, (ii) unenforceable _|_1jConditional obligation, (Hi) equitable principles of waiver and estoppel, and (iv) prematurity. We separately address each category.
(i) ambiguous policy language
The OPSB contends that the provisions of the Ordinance or Law Endorsement are ambiguous. The OPSB does not contend that the endorsement language “repairs or replacement” or “not to exceed two years” is ambiguous; rather, it contends that the endorsement language, tracked in the trial court’s judgment, “increased construction costs” is ambiguous. According to the OPSB, because the phrase “increased construction costs” is not defined in the endorsement itself or anywhere else in the policies, it will have to speculate as to the meaning of the phrase. The OPSB thus contends the phrase is ambiguous, that this ambiguity implicates the rule of strict construction against the insurer, and that this ambiguity renders the granting of summary judgment inappropriate.
RSUI counters that simply because the OPSB expresses confusion does not render the policy language ambiguous. RSUI cites the principle that in order for policy language to be ambiguous, and thus invoke the rule of strict construction against an insurer, it must be susceptible to two or more reasonable interpretations. Zeitoun v. Orleans Parish School Bd., 09-1130, p. 5 (La.App. 4 Cir. 3/3/10), 33 So.3d 361, 365 (noting that “for the rule of strict construction to apply, the insurance policy must not only be susceptible to two or more inter *1214 pretations, but each of the alternative interpretations must be reasonable.”). RSUI points out that the OPSB failed to provide two differing, reasonable interpretations of the phrase “increased construction costs.” RSUI additionally points out that even assuming, arguendo, any ambiguity exists in the phrase “increased construction costs,” it 11Rwould not affect the two-year limitation period, which the trial court found is unambiguous.
Although the phrase “increased construction costs” is not defined in the policy itself, this fact alone does not make the endorsement ambiguous; rather, this fact requires a court give the words and phrases their generally prevailing meaning. Cadwallader, 02-1637 at p. 4, 848 So.2d at 580; see also American Deposit Ins. Co. v. Myles, 00-2457, p. 7 (La.4/25/01), 783 So.2d 1282, 1287. “Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.” McGuire v. American Southern Home Ins. Co., 07-0810, p. 3 (La.App. 4 Cir. 10/10/07), 969 So.2d 681, 684 (citing La. C.C. art.2047; Cadwallader, 02-1637 at p. 3, 848 So.2d at 580; and Carbon v. Allstate Ins. Co., 97-3085, p. 4 (La.10/20/98), 719 So.2d 437, 439-40). “The rule that words in an insurance policy must be given their reasonable and ordinary interpretation applies notwithstanding the rule of construction against the insurer.” 2 COUCH ON INS. § 22:15. Applying these principles, we find, as RSUI contends, that there is nothing ambiguous in the phrase “increased construction costs.”
(ii) unenforceable conditional obligation
The OPSB next contends that regardless of whether the two-year limitation period is unambiguous, it is an unenforceable suspensive condition under the Civil Code articles governing conditional obligations. The OPSB characterizes the two-year limitation period to repair or replace as a suspensive condition under La. C.C. art. 1767, which provides that “[i]f the obligation may not be enforced until the ^uncertain event occurs, the condition is suspensive.”[9] The OPSB maintains that the two-year limitation period to repair or replace is conditional because the payment of claims for “increased construction costs” depends upon the repair, replacement, or both, of the properties. It maintains that the two-year limitation period is suspen-sive because the payment of claims for “increased construction costs” cannot be enforced until the repair or replacement is made. RSUI does not dispute the characterization of the two-year limitation period as a suspensive condition.[10]
The OPSB’s argument that the suspen-sive condition is unenforceable can be divided into two parts. First, it contends that RSUI should not be allowed to benefit from a policy provision that contains an impossible suspensive condition dependent solely on the Defendant Insurers’ whim. La. C.C. arts. 1769 and 1770. Second, it contends that since the Defendant Insurers were at fault for the OPSB’s inability to repair all of its properties within the two-year limitation period (thereby complying with the contract provision), the contract provision should be deemed ful *1215 filled. La. C.C. art 1772. We separately address each of these arguments.
Articles 1769 and 1770
The OPSB’s first argument is that the Defendant Insurers’ improper claims handling procedures made it impossible for it to comply with the two-year limitation period. The OPSB thus characterizes the two-year period as an unenforceable, impossible condition under Article 1769. The OPSB also contends that the two-year limitation period was dependent solely on the Defendant |1sInsurers’ whim to make appropriate tenders and therefore is unenforceable under Article 1770.
RSUI counters that the OPSB misconstrues Articles 1769 and 1770. According to RSUI, the impossible suspensive condition and the whim-based suspensive condition would nullify any obligation of the Defendant Insurers to pay the increased cost of construction, not the suspensive condition. In support of this construction, RSUI quotes the language of Articles 1769 and 1770, which respectively provide that an impossible suspensive condition “makes the obligation null” and that a suspensive condition dependent solely on an obligor’s whim “makes the obligation null.”
Contrary to the OPSB’s contention, we find that neither Article 1769 nor Article 1770 apply in this case.
Although an impossible condition is one contemplating the occurrence of an event that cannot take place, “Civil Code [Article 1769] is concerned with absolute impossibility.” Hamilton v. Anco Insulation, Inc., 02-0221, p. 10 (La.App. 1 Cir. 2/14/03), 844 So.2d 893, 899-900 (finding policy condition that a claim for “bodily injury by disease” be made within thirty-six months of the policy’s expiration was impossible under the facts of the case involving a mesothelioma victim, but was not an impossible condition in all cases as required by La. C.C. art. 1769). An impossible condition, under Article 1769, is not simply one that is impossible under the facts of a given case; rather, it is one that is impossible in all cases. Id. Stated otherwise, “impossible conditions, as contemplated in La. C.C. art. 1769, are those in which ‘no one can bring about the events of which they consist.’ ” Hamilton, 02-0221 at p. 10, 844 So.2d at 899-900 (quoting 5 Saúl Litvinoff, La. Civ. L. Treatise, THE LAW OF OBLIGATIONS § 5.5 p. 75 (2nd ed.2001)). Thus, 11fithe two-year limitation period, even assuming arguendo it was impossible in this Hurricane Katrina case, is not an impossible condition under Article 1769.
Nor is the Defendant Insurers’ obligation to tender amounts due under their policies dependent solely on their whim. Whim means “[a] passing fancy, an impulse.” Bryan A. Garner, BLACK’S LAW DICTIONARY 1627 (8th ed.2004). The comments to Article 1770 state that “[a]n event which is left to the obligor’s whim is one whose occurrence depends entirely on his will, such as his wishing or not wishing something.” La. C.C. art. 1770, Official Comment (d). The Defendant Insurers’ obligation to pay under their policies is not solely dependent on their whim; it is governed by the insurance contracts.
Article 1772
The second part of the OPSB’s unenforceable conditional obligation argument is that since the Defendant Insurers were at fault for the OPSB’s inability to repair all of its properties within the two-year limitation period (thereby complying with the contract provision), the contract provision should be deemed fulfilled under La. C.C. art. 1772. As noted, Article 1772 provides that “[a] condition is regarded as fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment.” La. C.C. art. *1216 1772. Article 1772 is analogous to the common law prevention of performance doctrine, which is defined as “[t]he principle that each contracting party has an implied duty to not do anything that prevents the other party from performing its obligation.” Bryan A. Garner, BLACK’S LAW DICTIONARY 1226 (8th ed.2004); see also In re Crutcher-Tufts Resources, Inc., 504 F.3d 535, 542 (5th Cir.2007) (referring to “frustration” of performance of obligation under La. C.C. art. 1772).
_|jjAlthough the OPSB raised the impossibility argument in opposing the motions for summary judgment, it did not raise the issue of the Defendant Insurers’ alleged fault under Article 1772 until it filed its motion for new trial.[11] According to the OPSB, the Defendant Insurers’ fault is their bad faith in failing to properly adjust the OPSB’s claims and failing to tender adequate amounts under the policies for the property damage sustained.
In support of the bad faith argument, the OPSB cites La. R.S. 22:1892, which requires that insurers initiate loss adjustment for catastrophic property damage claims within thirty days of notification and make a written offer to settle property damage claims within thirty days of receiving satisfactory proof of loss.[12] Although the OPSB did not file a complete proof of loss until 2011, it contends that “satisfactory proof of loss” was received by the Defendant Insurers when their representatives walked through all of the OPSB’s properties shortly after Hurricane Katrina. The OPSB cites Louisiana Bag Co. v. Audubon Indem. Co., 08-0453, p. 24 (La.12/2/08), 999 So.2d 1104, 1119-20 (La.2008), for the proposition that “an insurer’s requirement that it receive its form of proof of loss before payment is | ^insufficient to create probable cause to delay payment. To allow an insurer to do so would frustrate the intent and purpose of La. R.S. § 22:658 as it would allow the insurer to be solely in control of when proof of loss is received.” Id.
The OPSB cites the affidavit of Mr. Smith, its Chief Financial Officer, as establishing that it lacked sufficient funds to make the repairs or replacements during the two-year limitation period. According to the OPSB, its lack of sufficient funds was further evidenced by the almost $71 million in repair invoices (which did not include repairs for all properties) it submitted to the Defendant Insurers in May 2007, just a few months before the end of the two-year limitation period. The OPSB points out that despite being presented with these figures, the Defendant Insurers tendered only $25 million (out of a total coverage of $200 million) within the two-year limitation period. The OPSB further points out that “[bjecause the Defendant Insurers failed to make tenders under their policies, the OPSB was forced to file *1217 suit for breach of contract and bad faith and had to delay restoration efforts.” The OPSB thus contends that it established fault — bad faith — on the part of the Defendant Insurers and that the suspensive condition should be deemed fulfilled under Article 1772.
In further support of its position, the OPSB cites a trio of out-of-state cases for the proposition that when an insurance company prevents an insured’s compliance with a condition precedent (suspensive condition) to receive additional coverage, the insured is excused from performing that condition precedent. Pollock v. Fire Ins. Exchange, 167 Mich.App. 415, 423 N.W.2d 234 (1988); Zaitchick v. American Motorists Ins. Co., 554 F.Supp. 209, 211 (D.C.N.Y.1982); and Dickler v. CIGNA Property and Cas. Co., 957 F.2d 1088 (3d Cir.1992). By analogy, the OPSB contends that the Defendant Insurers should not be allowed to benefit from 119their own bad faith in failing to make timely tenders under their policies and withholding funds.
RSUI counters that under the policies a proof of loss was a prerequisite for any payment obligation of the insurers. It emphasizes that the OPSB sought extensions of the deadline to file a proof of loss and that it failed to file a full proof of loss until the trial court ordered it to do so in 2011. It contends that the OPSB’s reliance on the Louisiana Bag case is misplaced; the Louisiana Supreme Court in the Louisiana Bag case simply held that an insurer must pay amounts “over which reasonable minds could not differ.” Louisiana Bag, 08-0453 at p. 16, 999 So.2d at 1116. RSUI further counters that the trio of out-of-state cases on which the OPSB relies is distinguishable. According to RSUI, those cases simply establish that “an insurer must actively prevent compliance with policy provisions before an additional award is justified.” RSUI contends that the OPSB failed to provide any facts that would justify either analogizing to those out-of-state cases or establishing that the Defendant Insurers were at fault under Article 1772. RSUI emphasizes that the OPSB itself delayed resolution of its claims by repeatedly seeking extensions of both the time to file a proof of loss and the discovery deadlines in this litigation. RSUI further emphasizes the OPSB’s failure to seek an extension of the two-year limitation period.
RSUI still further emphasizes that Mr. Smith’s affidavit neither mentions nor addresses any fault on the part of the Defendant Insurers in causing the delay in completing the repairs or replacements. Instead, his affidavit states that there were multiple “financial and non-financial challenges which needed to be overcome to get schools open within the first two years after Hurricane Katrina,” including determining “where the needs of the children would be post Katrina.” The affidavit [2nexpressly enumerates the following reasons why the OPSB believed that completing repairs and replacements within two years following Hurricane Katrina was impossible: “[t]he time for obtaining necessary funds, complying with Louisiana administrative law to get approval to rebuild or repair schools, perform due diligence with construction companies, issue contracts, in addition to the necessary construction time (which often included delays).”
RSUI points out that in the event the OPSB determined that it was impossible to repair or replace its properties within the two-year period, a mechanism was available to it under the policy — request a written extension of the two-year limitation period before the period elapsed. RSUI further points out that the OPSB requested and obtained numerous extensions of the proof of loss and discovery deadlines; however, the OPSB never requested an *1218 extension of the two-year limitation period. The OPSB’s failure to request an extension, RSUI contends, belies its contention of fault on the part of the Defendant Insurers in hindering its ability to comply with the requirements of the Ordinance and Law Endorsement. We agree.
The OPSB’s reliance on bad faith jurisprudence, such as Louisiana Bag case, and the trio of out-of-state cases is misplaced. The Supreme Court in the Louisiana Bag case held that “an insurer need not pay a disputed amount in a claim for which there are substantial, reasonable and legitimate questions as to the extent of the insurer’s liability or of the insured’s loss.” Louisiana Bag, 08-0453 at p. 16, 999 So.2d at 1116. The Louisiana Bag case thus stands simply for the position that penalties are appropriate when an insurer fails to pay the undisputed amount due. See French v. Allstate Indem. Co., 637 F.3d 571, 585 (5th Cir.2011).
|2iAs a commentator points out, the trio of out-of-state cases on which the OPSB relies is factually similar in the following respect:
Courts typically excuse performance if the insurer wrongfully withholds payment of the actual cash value proceeds and engages in conduct that: (1) manifests a callous disregard of the insured’s rights under the policy; (2) is extreme or outrageous and designed to deprive the insured of its rights under the policy; or (3) manifests an absence of good faith. Ultimately, whether performance of the condition precedent is excused depends upon whether the insurer acted in good faith during the claims process.
Johnny Parker, Replacement Cost Coverage: A Legal Primer, 34 Wake Forest L.Rev. 295, 323 (1999).
Both the Louisiana Bag case and the trio of out-of-state cases address the issue of an insurer’s bad faith during the claims process. The gist of the OPSB’s argument is that there is a genuine issue of material fact in this case regarding the Defendant Insurers’ alleged fault — bad faith — and that summary judgment was therefore inappropriately granted. Addressing this argument, the trial court at the hearing on the motion for new trial noted that the OPSB was requesting that it “reform the contract and nullify that provision [the suspensive condition].” The trial court further noted that this argument was premised on the Defendant Insurers’ failure to tender sufficient funds. In its reasons for judgment, the trial court noted that the “OPSB claims, however, that Westchester and RSUI are at fault for the OPSB’s inability to repair all of its properties within the two year time period thereby complying with the contract provision, and because of that, the contract provision should be deemed fulfilled.” Finding the policy language clear and unambiguous, the trial court denied the motion for new trial and thereby implicitly rejected the OPSB’s reliance on Article 1772 to excuse compliance with the suspen-sive condition. We find no error in the trial court’s ruling.
| p/fhe application of the prevention of performance doctrine to excuse an insured from the clear and unambiguous requirement of repairing or replacing as a condition precedent to recovery under the policy has been rejected by other courts. See Florida Ins. Guar. Ass’n v. Somerset Homeowners Ass’n., Inc., 83 So.3d 850, 852 (Fla.App. 4 Dist.2011) (citing Buckley Towers Condo., Inc. v. QBE Ins. Corp., 395 Fed.Appx. 659 (11th Cir.2010)). As the Buckley court explained:
“Applying the doctrine of prevention of performance in this case would imper-missibly rewrite the insurance contract on the equitable theory that it would be too costly for Buckley Towers to comply with the terms of the agreement.... [CJourts are not free to rewrite the terms of an insurance contract and *1219 where a policy provision ‘is clear and unambiguous, it should be enforced according to its terms.’ ”
Somerset Homeowners, 83 So.3d at 852 (quoting Buckley, 395 Fed.Appx. at 663 (quoting Acosta, Inc. v. Nat’l. Union Fire Ins. Co., 39 So.3d 565, 573 (Fla. 1st DCA 2010))). As noted, the trial court in this case gave similar reasons for implicitly rejecting the OPSB’s reliance on Article 1772 (the doctrine of prevention of performance). We find no error in the trial court’s ruling. We thus find the OPSB’s reliance on Article 1772 (the doctrine of frustration of performance) misplaced.
(iii) equitable principles of waiver and estoppel
The OPSB next contends that the trial court erred in granting summary judgment because genuine issues of material fact exist as to “whether the Defendant Insurers extended the two-year period OR should be estopped and/or waived their right to enforce the two-year period.” The record reflects that the Defendant Insurers, through their affidavits, established that they never extended the two-year limitation period. The OPSB presented no evidence to the contrary. Nonetheless, as the OPSB contends, under the equitable principles of waiver and l^estoppel, the conduct of the parties may modify the coverage provided by the policy. 15 William Shelby McKenzie, H. Alston Johnson, III, La. Civ. L. Treatise, INSURANCE LAW & PRACTICE § 1:5 (4th ed.2012). We separately address each of the equitable theories of waiver and estoppel.
Waiver
The waiver theory was extensively reviewed by this court in Arceneaux v. Amstar Corp., 06-1592 (La.App. 4 Cir. 10/31/07), 969 So.2d 755. This court noted that the two seminal Louisiana Supreme Court cases on waiver are Tate v. Charles Aguillard Ins. & Real Estate, Inc., 508 So.2d 1371 (La.1987); and Steptore v. Masco Constr. Co., 93-2064 (La.8/18/94), 643 So.2d 1213. Arceneaux, 06-1592, p. 10, 969 So.2d at 765. We further noted that the Supreme Court in Tate extensively reviewed the out-of-state jurisprudence on waiver; rejected the then-majority view that “waiver cannot be invoked to broaden coverage to include risks not included or expressly excluded from the insurance contract,” Id.; and held that “ ‘the best view is that waiver may apply to any provision of an insurance contract under which the insurer knowingly and voluntarily elects to relinquish his right, power or privilege to avoid liability, even though the effect may bring within coverage risks originally excluded or not covered.’ ” Id. (quoting Tate, 508 So.2d at 1375).[13] We further *1220 noted that the ^Supreme Court in the Tate case nevertheless cautioned that “ ‘reliable proof of such knowing and voluntary waiver is necessary and the burden of producing it, as in the proof of obligations, generally falls on the party who demands performance.’ ” Id.
In Steptore, the Supreme Court reaffirmed the principle it set forth in Tate that any policy provision can be waived; and it further defined the proof required to establish a waiver by enumerating the following four elements of waiver: (1) an existing legal right; (2) knowledge of the existence of that right; and (3) either (a) an actual intention to relinquish the right, or (b) conduct so inconsistent with the intent to enforce the right so as to induce a reasonable belief that the right has been relinquished. Arceneaux, 06-1592, p. 14, 969 So.2d at 767 (citing Steptore, 93-2064 at p. 4, 643 So.2d at 1216).
The OPSB contends that the Defendant Insurers waived their right to raise the two-year limitation period because they failed to raise it in either their reservation of rights letters or their original answers that they filed within the two-year period. The OPSB further contends that the two-year limitation period is an affirmative defense that under La. C.C.P. art. 1005 is required to be specifically pleaded in a defendant’s answer. The OPSB still further contends that the 1 ^requirement of specifically pleading an affirmative defense is not satisfied by pleading an insurance policy “in extenso.” Dixie Savings and Loan Ass’n v. Pitre, 99-154, pp. 23-24 (La.App. 5 Cir. 7/27/99), 751 So.2d 911, 924-25.
The OPSB argues that the Defendant Insurers’ failure to specifically mention the two-year limitation period in their original answers, which tracked the language of their reservation of rights letters, resulted in a waiver of their right to assert the two-year condition. The OPSB further argues that since the Defendants Insurers cited only the title to the Ordinance or Law Endorsement in their original answers and reservation of rights letters, they “denied all coverage for ordinance or law which is a clear misrepresentation of the policy coverages, or a failure to divulge pertinent facts, such as the fact that Ordinance or Law coverage was added back to the policy by endorsement (with conditions).”
RSUI responds that the OPSB’s contention is not that the Defendant Insurers failed to cite the applicable endorsement provision in their reservation of rights letters and original answers; rather the OPSB’s contention is that they failed to “quote the applicable provision rather than citing it and providing the number of the applicable endorsement form.” RSUI argues that this contention is without merit. RSUI further argues that the Defendant Insurers pleaded the Ordinance or Law *1221 Endorsement as an affirmative defense and raised it in their reservation of rights letters; hence, there was no waiver. We agree.
In the March 28, 2006 reservation of rights letter, RSUI’s Vice President, Mr. Koski, advised the OPSB that it had been investigating the OPSB’s claim “under a complete reservation of rights” and that “one or more of the following provisions may be applicable to the loss.” The listed provisions that followed included both the Ordinance or Law Exclusion and the Ordinance or Law ^Endorsement. The Ordinance or Law Exclusion was quoted, but the Ordinance or Law Exclusion was referenced as follows: “ENDORSEMENT # 002-ORDINANCE OR LAW COVERAGE.” RSUI’s letter closed with the following statement: “Please be further advised that RSUI does not waive any provision or stipulation of the policy or waive any right or defense under that policy whether or not identified above. RSUI reserves all of its rights under the policy and applicable law.”[14]
In their original answers and affirmative defense, filed in January 2007, the Defendant Insurers quoted the Ordinance or Law Exclusion in full, but only cited the Ordinance or Law Endorsement by title and number.[15] In their original answers they averred that “[a]ll or some of the damages for which the plaintiff seeks recovery may be excluded, restricted or limited from coverage under the primary policy’s Ordinance or Law coverage as set forth in Endorsement # 002 [Form bearing the following identifiers: CPO404(Ed. 07/88); LX1086].” In their subsequent answers and affirmative defenses, which were filed in response to the OPSB’s November 2009 Second Amended and Supplemental Petition and thus after the two-year period elapsed, the Defendant Insurers quoted in full the Ordinance or Law Endorsement, including the two-year limitation period.
1 ¡^Contrary to the OPSB’s contention, the Defendant Insurers expressly reserved their rights in their reservation of rights letters that were sent to the OPSB before the expiration of the two-year period. “A prompt reservation of rights letter serves the purpose of negating the inference of a voluntary relinquishment of a known right to contest coverage.” Arceneaux, 06-1592 at p. 16, 969 So.2d at 768 (citing Robert Keeton, Insurance Law § 6.6 (1971)). In both their reservation of rights letters and original answers, the Defendant Insurers cited the pertinent provision — the Ordinance or Law Endorsement — by title, endorsement number, form number, and relevant endorsement heading. The Defendant Insurers, as RSUI contends, thereby fairly apprised the OPSB of their intent to rely on the *1222 Ordinance or Law Endorsement. See River Bend Capital, LLC v. Lloyd’s of London, 10-1317, p. 5 (La.App. 4 Cir. 4/13/11), 63 So.3d 1092, 1097 (finding insurer effectively communicated that the doctrine of accord and satisfaction would be asserted as a defense despite its failure to include the magic words “accord and satisfaction”).
Nor do we find persuasive the OPSB’s contention that the Defendant Insurers had a duty to inform them of the two-year limitation period. “An insured cannot, absent a statute to the contrary, ordinarily avoid a limitations provision on the grounds of not having been advised of its existence by the insurer.” 2 Allan Windt, INSURANCE CLAIMS & DISPUTES, REPRESENTATION OF INSURANCE COMPANIES AND INSUREDS, § 9.5 (5th ed.2007) (citing Stephens v. Audubon Ins. Co., 27,658 (La.App. 2 Cir. 12/6/95), 665 So.2d 683, 686). An insured is presumed to know the contents of its policy. Id.; see also Isidore Newman School v. J. Everett Eaves, Inc., 09-2161, pp. 8-9 (La.7/6/10), 42 So.3d 352, 357. “Any feigned ignorance of the policy’s endorsements and ^exclusions does not affect their validity.” Piligra v. America’s Best Value Inn, 10-254, p. 13 (La.App. 3 Cir. 10/6/10), 49 So.3d 479, 487-88. An insured thus cannot “blame the insurance company for his or her own failure to read the policy.” Windt, supra. The OPSB’s reliance on the waiver doctrine is thus misplaced.
Estoppel
To establish an estoppel claim, a party is required to prove the following three elements: “(1) A representation by conduct or work; (2) justifiable reliance thereon; and (3) a change of position to one’s detriment because of the reliance on such representation.” Case v. Louisiana Medical Mut. Ins. Co., 624 So.2d 1285, 1290 (La.App. 3rd Cir.1993); see also South Central Bell Telephone v. Rouse Company of Louisiana, 590 So.2d 801, 804 (La.App. 4th Cir.1991) (citation omitted).[16]
The OPSB’s estoppel argument is based on the series of correspondence documenting the written agreements between the parties to extend the policy deadline for filing a proof of loss and the discovery deadline in this suit. The OPSB contends that it relied on these extensions and that it believed these extensions included all time limitations under its policy. RSUI counters that the series of correspondence on which the OPSB relies related to providing papers — the proof of claim required under the policy and the discovery responses in this litigation. RSUI further counters that the OPSB presented no evidence that the Defendant Insurers made any representations supporting the OPSB’s position.
[2SAs noted, the Defendant Insurers presented affidavits in support of their motions for summary judgment establishing that the Defendant Insurers never granted a written an extension of the two-year limitation period. The OPSB, as RSUI contends, failed to present *1223 any evidence that the Defendant Insurers made any representations that any of the insurers were extending the two-year limitation period. Moreover, such an extension was required by the policy to be in writing. Neither granting an extension of time to provide discovery responses nor granting an extension of time to file a proof of loss can reasonably be equated with an extension of the two-year limitation period for repairs or replacement under the policy. See L.T. v. Chandler, 40,-417, p. 7 (La.App. 2 Cir. 12/14/05), 917 So.2d 753, 758 (rejecting estoppel claim given that “[n]o representation was made to the plaintiffs that there definitely was insurance coverage for all claims made”); Case, 624 So.2d at 1287. Estoppel is disfavored in Louisiana law and “rarely applied.” Id. This is not one of the rare cases in which estoppel should be applied.
In sum, we find the OPSB’s reliance on the equitable theories of waiver and estop-pel misplaced.
(iv) prematurity
The OPSB contends, as it did before the trial court, that the motion for summary judgment was decided prematurely. The OPSB maintains that the trial court erred by deciding the motion for summary judgment because important discovery was not completed. In support, the OPSB cites La. C.C.P. art. 966 C(l), which provides that summary judgment should only be considered “[ajfter adequate discovery or a case is set for trial.”
Construing Article 966, this court has held that “while' parties must be given fair opportunity to carry out discovery and present their claim, there is no absolute |snright to delay action on motion for summary judgment until discovery is complete.” Thomas v. North 40 Land Development, Inc., 04-0610, p. 31 (La.App. 4 Cir. 1/26/05), 894 So.2d 1160, 1179 (quoting Butzman v. Louisiana Power and Light Co., 96-2073, p. 4 (La.App. 4 Cir. 4/30/97), 694 So.2d 514, 517). Similarly, construing article 966, the Louisiana Supreme Court has held that “[t]he only requirement is that the parties be given a fair opportunity to present their claim. Unless plaintiff shows a probable injustice a suit should not be delayed pending discovery when it appears at an early stage that there is no genuine issue of fact.” Simoneaux v. E.I. du Pont de Nemours and Co., 483 So.2d 908, 912-13 (La.1986).
When the words of an insurance contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent (La.C.C. art.2046); and additional discovery cannot change the result. See Hamilton v. Willis, 09-0370, p. 3 (La.App. 4 Cir. 11/4/09), 24 So.3d 946, 948 (rejecting argument that summary judgment was premature, noting that “[additional discovery cannot change the motor-sports exclusion, which we find to be clear and unambiguous and not leading to absurd consequences”); River Bend Capital, 10-1317 at p. 5, 63 So.3d at 1096 (holding that “[f]urther discovery ... is unnecessary where the language is clear and unambiguous as here”). Such is the case here. Thus, we find no abuse of discretion in the trial court’s finding that summary judgment was appropriate at this procedural juncture.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED

. This case was removed to federal court, but was remanded to state court. Orleans Parish School Bd. v. Lexington Ins. Co., 2007 WL 1558640 (E.D.La.2007) (unpub.). The Louisiana Department of Education, the Board of Elementary and Secondary Education, and the Recovery School District intervened in the suit. There have been multiple prior appeals to this court in this case. See Orleans Parish School Bd. v. Lexington Ins. Co., 11-0009 (La.App. 4 Cir. 10/5/11), 76 So.3d 592; Orleans Parish School Bd. v. Lexington Ins. Co., 11-1753 (La.App. 4 Cir. 6/13/12), 95 So.3d 1205; and Orleans Parish School Bd. v. Lexington Ins. Co., 11-1720 (La.App. 4 Cir. 8/22/12), 99 So.3d 723.

. For ease of discussion, the four excess insurers are referred to in this opinion as the "Excess Insurers,” and all five insurers are referred to collectively as the "Defendant Insurers.”

. A following-form policy is defined as "[a]n insurance policy that adopts the terms and conditions of another insurance policy.” Bryan A. Garner, Black's Law Dictionary, 821 (8th ed.2004); see Rivere v. Heroman, 96-1568, p. 2 (La.App. 4 Cir. 2/5/97), 688 So.2d 1293, 1294. Unless there is an express exception to the form of the underlying policy, the excess insurer under a following-form policy is governed by the underlying policy’s terms. Toston v. Nat'l. Union Fire Ins. Co. of La., 41,567, p. 5 (La.App. 2 Cir. 11/3/06), 942 So.2d 1204, 1207.

. The insurance policies at issue were in effect between May 1, 2005, and May 1, 2006.

. Two motions for summary judgment were filed. Clarendon filed its own motion and the other three Excess Insurers filed a joint motion. Before the instant motions for summary judgment were filed, Lexington settled its claim and was dismissed from the suit. Subsequent to the hearing on the motions for summary judgment, two of the four excess insurers, Essex and Clarendon, settled their claims. Before this appeal was lodged, another of the excess insurers, Westchester, settled its claim. RSUI is the only remaining defendant, and it is the sole appellee. Nonetheless, this appeal affects, and the OPSB seeks a ruling on, "all layers of coverage as the excess polices are 'follow form' policies, which means the excess policies follow the terms, conditions, and definitions of coverage and recover stated in the primary policy, and coverage under the excess policies for increased costs of construction is also limited to two years from the date of loss."

. This provision is referred to in this opinion as the "Ordinance or Law Exclusion.”

. This provision is referred to in this opinion as the “Ordinance or Law Endorsement.” The Lexington policy provided that “A SUB-LIMIT OF 25% OF THE COVERED LOSS OR $5,000,000., WHICHEVER IS GREATER SHALL APPLY SEPARATELY TO DEBRIS REMOVAL AND DEMOLITION & INCREASED COSTS OF CONSTRUCTION (DICC), AND LAW & ORDINANCE.” As the OPSB points out, this additional coverage is limited to $50 million (25% of $200 million).

. The Lexington policy provides that “[t]he Insured shall complete and sign a sworn proof of loss within ninety (90) days after the occurrence of a loss (unless such period be extended by the written agreement of the Company)." The policy further provides that "[a]ll adjusted claims shall be due and payable thirty (30) days after the presentation and acceptance of satisfactory proof(s).”

. A suspensive condition is the equivalent of the common law condition precedent. Southern States Masonry, Inc. v. J.A. Jones Const. Co., 507 So.2d 198, 204, n. 15 (La.1987) (citation omitted).

. The two-year limitation period also falls under La. C.C. art. 1773, which provides that "[i]f the condition is that an event shall occur within a fixed time and that time elapses without the occurrence of the event, the condition is considered to have failed.”

. On appeal, the OPSB filed a motion to supplement the record with evidence it offered in support of its motion for new trial. This court denied the motion to supplement. See Blount v. Exxon Corp., 395 So.2d 355, 358 (La.App. 1st Cir.1981) (noting that “until a new trial is granted, [new evidence] attached to plaintiff-appellant's motion for a new trial are not before this court and form no part of the record on appeal.”); see also 2 Judge Steven R. Plotkin and Maty Beth Akin, LA. PRAC. CIV. PROC., Article 966 (2012) (noting that “[a]n appellate court may not consider evidence that was not before the trial court when it reviews the granting of a motion for summary judgment.”).

. La. R.S. 22:1892 A provides:
(3) ... In the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim within thirty days after notification of loss by the claimant....
(4) All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim.

. Given that Louisiana law differs from other states (including Mississippi) on this point, the OPSB contends that RSUI’s reliance on Edgewood Manor Apartment Homes LLC v. RSUI Indem. Co., 782 F.Supp.2d 716 (E.D.Wis.2011), is misplaced. In Edgewood, which involved the same Ordinance or Law Endorsement as this case, the federal district court, applying Mississippi law, held that RSUI’s failure to raise the two-year limitation period did not result in the waiver of that defense, reasoning:
Plaintiffs’ only worthy argument is that RSUI failed to note this two-year deadline in its letters rejecting any future obligations if Southland sold the property, thus waiving this point. But the argument is not persuasive. Under Mississippi law, "[wjaiver is the voluntary relinquishment of known right.” But the waiver doctrine cannot be used to create coverage or expand existing coverage to risks that are expressly excluded by a policy. RSUI did not relinquish voluntarily any right under the two-year clause for code upgrades. Neither Steber’s March 12, 2008, letter nor Murphy's July 29, 2008, letter mentioned the two-year time limit. Those letters reserved all other rights under the RSUI Policy, whether or not mentioned at that time, and stated that any failure to raise other terms and condi *1220 tions of the RSUI Policy in the letters "should not be deemed a waiver of RSUI Indemnity Company's right to do so in the future should circumstances warrant."
No express waiver or voluntary relinquishment of the two-year time limit was made. And in light of RSUI's reservation of rights under other provisions of the RSUI Policy, no implied waiver may be found and no reasonable jury would conclude otherwise. Moreover, the doctrine of waiver cannot be used to extend coverage to increased costs that occur outside the period delimited by the policy. Thus, summary judgment will be denied to plaintiffs and granted in defendant's favor on the issue of code upgrade proceeds.
Edgewood, 782 F.Supp.2d at 729-30 (citations omitted).
RSUI cites Edgewood only for the proposition that even if it had failed to raise the two-year limitation period it would not have waived the defense. Since RSUI did raise the two-year limitation period in this case, we find it unnecessary to determine whether, as the OPSB contends, Edgewood is distinguishable.

. Essex's reservation of rights letter included similar language; in addition, it stated: "Please be advised that neither Mr. Beaver nor other representatives of the Essex Insurance Company have the right to waive any of the Policy provisions or determine any coverage position.”

. The OPSB points out that four of the five Defendant Insurers were represented by the same counsel and filed answers containing the same language. As the OPSB notes, these insurers’ original answers tracked the language of their reservation of rights letters. The fifth insurer, Clarendon, included the following language in its original answer:
Plaintiff's claims herein are limited by the terms and conditions of the insurance policy issued by Clarendon and all of its endorsements which are attached in full to this answer and expressly incorporated into the answer as if copied herein in extenso. Plaintiff’s claims are diminished and/or barred by the other insurance provisions of the Clarendon policy.
Moreover, Clarendon adopted "the affirmative defenses of each and every similarly situated defendant.”

. The Louisiana Legislature codified a form of equitable estoppel in La. C.C. art. 1967. Lakeland Anesthesia, Inc. v. United Healthcare of Louisiana, Inc., 03-1662, p. 18 (La.App. 4 Cir. 3/17/04), 871 So.2d 380, 393 (citing Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 528 (5th Cir.2000) (noting that detrimental reliance is one of the elements required for the usual application of equitable estoppel)). Article 1967 provides that "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying.” La. C.C. art. 1967.